MARY ALDRICH, Respondent, v. ST. LOUIS TRANSIT COMPANY, Appellant.

St. Louis Court of Appeals, April 14, 1903.

1. **Street Railway: MOTORMAN: CONTROL OF CAR, WHEN NECESSARY: NEGLIGENCE.** Where the motorman in charge of a street car sees a pedestrian about to cross the street a distance of eighty yards ahead of the car, he is not bound to put the car under control, instead of relying on an observation of the car by the pedestrian.

2. **———: ———: ———: DEAFNESS OF PLAINTIFF.** Where one crossing a street in front of a street car, the bell of which is being rung, does not stop or notice the car, but continues to go forward toward the track, apparently absorbed in a paper, such behavior should amount to a warning to the motorman to get ready to avoid an accident, but the fact that a person is deaf does not relieve her from care in crossing street railroad tracks, but imposes on her the duty of looking to learn whether she may safely proceed in crossing a track.

3. **———: NEGLIGENCE: FAILURE TO LOOK AND LISTEN, CONTRIBUTORY NEGLIGENCE.** Ordinary care and prudence require a person who is about to cross a railroad track at a street or public crossing, to look and listen for a train when by looking he could see, or by listening he could hear, an approaching train; and the omission to do either would be such negligence on his part as to prevent a recovery for an injury, provided his perilous condition was not and could not, by the exercise of ordinary diligence, have been discovered in time to avoid injuring him.

4. **———: ———: MOTORMAN, DUTY OF.** It is no duty of a motorman to stop cars in anticipation that a person who is going over a street crossing, and has time to get over before the car reaches her, may stop or turn around on the track and in consequence be run down.

Appeal from St. Charles Circuit Court.—*Hon. Elliott M. Hughes,* Judge.

REVERSED.

STATEMENT.

One of the defendant's street cars ran against the plaintiff, May 13, 1901, at the intersection of Fourteenth street and St. Louis avenue in the city of St. Louis and injured her severely. That accident gave rise to this litigation, the plaintiff charging in her petition that it was caused by the negligence of the defendant's carmen or servants in failing to use proper efforts to stop the car after they saw the plaintiff's position of peril on defendant's track; or to use ordinary care to discover her peril. The "vigilant watch" ordinance is pleaded in the petition and also the municipal regulation that street cars shall not be run at a higher rate of speed than eight miles an hour. The defendant company is charged with the violation of both those regulations, there being allegations that the car which struck the plaintiff was running at a speed in excess of the limit imposed by the ordinance and that the carmen neglected to vigilantly watch for persons on the track.

The answer denies the allegations of the petition and alleges the special defense that plaintiff negligently and carelessly went on the track in front of the approaching car, when by looking and listening she might have noticed it and avoided the accident; that she negligently failed to observe her surroundings and in consequence thereof was struck.

Plaintiff has been deaf all her life and, of course, could not hear the approach of the car, nor the bell which the motorman appears to have rung vigorously in ample time to warn her but for her deafness. The accident occurred in the afternoon of a bright day, the circumstances being these: Plaintiff emerged from a bakery shop on the south side of St. Louis avenue about midway of the block between Thirteenth and Fourteenth streets; she walked towards Fourteenth and when she got to the corner, started across St. Louis avenue. A car was coming westward on the avenue and the mo-

torman, discerning that the plaintiff intended to cross the tracks, began to ring his bell when about eighty steps from the crossing, as the witnesses say; that is, about two hundred and forty feet. The plaintiff had her eyes fixed on a postal card, and not hearing the bell on account of her deafness, she crossed the south track, stepped on the north one along which the car was approaching, advanced to the north rail of the north track and had only a step to take to be out of danger when she suddenly whirled around with her back towards the car and her face to the west, stood in that position for a second, then turned around so as to face the south again, when the car struck her. The motorman had continually rung the bell from the time he began to ring it eighty steps away, to the instant of the collision. When the plaintiff stepped on the north track the car was only eighteen feet distant from her and nearly all the testimony on both sides is that it could not have been stopped then short of thirty-five or forty feet, even if it was running but eight miles an hour. From the time plaintiff stepped on the track in front of the car, the weight of the evidence is that the motorman did what he could to stop it, but was unable to stop quickly enough to avoid striking the plaintiff. There was testimony that it could have been stopped easily after the plaintiff began to cross the street; that is, stepped off the south sidewalk to go across. But the motorman rang the bell to give notice of its approach to the crossing, relying on the plaintiff heeding that warning.

Thomas Downs, a witness for the plaintiff, testified he was on the car and that his attention was attracted by the bell ringing; the car was then about fifty or sixty feet from the plaintiff, fifty feet anyhow; hearing the bell caused him to look out; plaintiff was then standing close to the middle of the track and seemed to be turning and twisting about like some one excited; did not know whether her back was to the car, but knew the

car hit the back part of her shoulder; she gave no evidence of hearing the bell but was standing in the middle of the track, turning and twisting around; the car was running at the usual speed; the motorman was sitting on his stool with his hand on the brake; he seemed to be turning and pushing it; he was turning and twisting the brake. This witness testified on cross-examination, that when he first saw the plaintiff the car was fifty feet away, and again that it was about thirty feet away; plaintiff remained standing there from that time until she was hit.

Adolph Briggs, also for the plaintiff, swore that he saw plaintiff come out of a house about the middle of the block with something in her hands. She met a young man as she went along; showed him what she had in her hands and made signs; he also made signs and she went west to the corner. When she got to the corner, witness saw the car coming as far back as Twelfth street; about a quarter of the way, or about eighty steps, the motorman saw plaintiff was going to cross the track and rang the bell; she at that time was in the track going over to the sidewalk on the other side of the street; the motorman kept ringing the bell; she went on looking at a postal card and stepped on the track; witness ran to her but then the car was coming and it was too late; she just went round and stopped and the car caught her, when she screamed and tumbled over; the car continued forty feet further; forty steps. This witness said again that plaintiff walked on the track and looked at the car and about that time the car struck her; she turned westward away from the car; had a sunbonnet on and did not look towards the car; witness said he stepped off the distance the car was away from the plaintiff when the motorman began to ring the bell and found it was eighty steps; said the conductor told him they were late and had to make up lost time; the motorman also told him the car was running faster than eight miles an hour. The motorman

checked the car when about the width of a building from the plaintiff. "If he had put on the brakes immediately when he began to ring the bell he could have stopped the car twice." This witness repeatedly said the car went forty feet beyond the plaintiff after striking her and added, forty steps; so it is impossible to tell what he meant. He testified the bakery was in the middle of the block and the car was in the middle of the block when she was on the track; that she stopped to read the postal card when she was on the second track; but that she could have made one more step and been across. "She looked at the postal card; she looked at the postal card before she reached the track; she was looking at the postal card before she reached the car; she continued to look at the card while she was walking; apparently she found an error in the postal card and turned around this way westward; she turned around with the idea to turn back." Witness also testified the car was about fifteen steps from the plaintiff when the motorman put on the brakes; and that he rang the bell continually after he put on the brake; rang the bell from eighty steps until the car struck her.

A witness for the plaintiff by the name of Fulky testified that he saw plaintiff standing on the walk about a foot in front of the "iron;" then saw her go across the street on Fourteenth street; then she got to St. Louis avenue, stood on the track and looked around. "When I looked a car was there; struck her right on the shoulder; she was standing on the track, turned around and looked south; the car did not slow down; did not get any slower." When he first saw the woman facing the track there was no car in sight.

Adelphina Briggs, for the plaintiff, testified she was eleven years old; saw plaintiff coming out of the house when the car was about Thirteenth street; plaintiff came up and met her husband; she went around the corner and across the street; then she was in the mid-

dle of the car track looking at a postal card. She must have seen some mistake and turned around and wanted to go back and the car was in the middle of the block and the bell was ringing and ringing. It could have been stopped a few times and saved her and when she turned around the car struck her. This witness testified the plaintiff had on a sunbonnet and was not facing the car but was facing from it; she was standing on the track and was going away when the car struck her. The motorman kept ringing the bell from the bakery until about eighteen feet from her, when he began to turn the crank. She testified on cross-examination that the plaintiff had her face turned towards the west and the car was about eighteen feet from her when she stood on the track reading a postal. This question was asked the witness: "Q. Now when she first stepped on the track or stepped between the tracks, where was the car? A. About eighteen feet."

James B. Dutton did not see the accident but knew the speed of cars and thought a car running eight miles an hour could be stopped in thirty or forty feet.

Charles Doyser, testified a car running eight miles an hour on dry rails could be stopped in thirty or thirty-five feet.

J. H. Hillenkoeter saw the accident; the day was clear and the tracks dry; thought the car was running at a speed of eighteen miles an hour; it stopped at the west crossing after striking plaintiff; witness did not notice if it checked speed before it struck her; he did not see the motorman make any effort to stop the car before it struck the plaintiff, but could not tell whether the motorman was standing up or sitting down. He testified on cross-examination that he did not see the car strike the woman; it had already struck her before he noticed. He saw the car when it was up to the woman and struck her and she was reading, he did not see the car until it was on top of her. The accident happened about four o'clock in the afternoon.

Samuel R. Stinebaker, for the plaintiff, testified he had worked as a motorman in St. Louis and Brooklyn, New York, and was familiar with stopping cars and that a car running about eight miles an hour could be stopped in four feet; could be stopped in eight or ten feet without reversing; running fifteen miles an hour, a car could be stopped by reversing in eight feet.

Mary Aldrich, the plaintiff, testified as follows:

"Q.　Were you struck by a car; answer yes, or no? A.　Yes.

"Q.　Did you look to see the car before going on the track?　A.　I did not see the car.

"Q.　Were you on the track when hit by car?　A. No.

"Q.　Did you turn around on the track?　A. Yes, I turned around on the track.

"Q.　Were you on the track, or turning off the track, when the car hit you?　A.　I was turned; take track, but I did not see the car to strike me; how I don't know.

"Q.　Did you stand on the track for one-half minute?　A.　Yes."

Cross-examination.

"Q.　Why did you not see the car?　A.　I did not see car, but I can't hear it.

"Q.　Do you know why you did not see car?　A. I don't know the car, but I see Henry.

"Q.　Did you look for a car?　A.　I did never look for it.

"Q.　Did you read letter on track?　A.　Yes, I did read it from my mother, sick.

"Q.　Did you read letter when car hit you?　A. No; I stopped one-half minute on track.

"Q.　Did you look on track?　A.　Yes; I did read it from my sick mother.

"Q.　Did you read letter when car hit you?　A. No; I stopped one-half minute, but turned around on track to see Henry.

"Q. What were you doing when the car hit you?
A. I don't know, how the car strike; I feel like I die,
nearly.

"Q. Did you tell Mrs. Kane and husband on Jan-
uary 29, 1902, at your house, that you took your sun-
bonnet to go on track to kill yourself and read letter?
A. I never tell Mrs. Kane and husband about that;
they are big liars, and talk about me and my husband;
I never kill myself, I am sure."

The foregoing is the substance of the testimony for
the plaintiff except the municipal ordinances.

Frank Shullych for the defendant, testified that
he was the motorman on the car which struck the plain-
tiff; that from the Fourteenth street crossing on St.
Louis avenue one could see east to Ninth street; when
he first saw plaintiff she was about two feet from the
south sidewalk on St. Louis avenue going across Four-
teenth street; she started to walk across the street; got
to the middle of the track; got to the north hand-rail;
struck the north hand-rail with her foot; turned and the
car was then about fifteen or twenty feet from her; she
stood in that position with her face to the west. Wit-
ness began to ring the bell a hundred feet or more east
of the crossings; plaintiff was then walking pretty fast.
He testified that if plaintiff had not stopped she would
have got off the track before he struck her. The car
was moving eight miles an hour, witness hallooed to
her, set his brake, stepped on the sand push, dropped
the fender and caught her on the fender. This witness
testified that Stinebaker was never a motorman but had
been tried as a motorman and not found capable, then
had been employed as a conductor; that a car running
about eight miles an hour could be stopped on a dry
rail in about forty feet. Witness further testified that
he thought from the plaintiff's manner she was going
to cross the track; then she looked up at the car as if
she heard something; she had plenty of time to have
gotten across the track if she had gone ahead; the car

was only fifteen or twenty feet from her when she stepped on the track.

Samuel Denton, for the defendant, said he was conductor on the car; was in the rear door and saw plaintiff walking north; saw her when she was about two steps from the south-bound track; she stepped on the track, made three steps to the north rail when she reversed herself and looked west. The car was then fifteen or twenty feet away, going at a speed of eight miles an hour. Plaintiff turned around and looked as though she was looking at something on the northwest corner, stepped back to the middle of the track and stood looking west. He testified that the motorman began to ring the bell about the middle of the block and hallooed so he could have been heard two blocks away; plaintiff had only one step to take and she would have been clear of the track; testified the car ran about a car-length after it struck plaintiff; that the car was running about eight miles an hour and not so fast when it hurt her; running at that rate of speed a car could be stopped in an emergency in about thirty feet; the motorman turned off the power when he was about fifty feet from the plaintiff.

Fred Appleton, for the defense, said the woman was walking north and looking towards the northwest corner and it seemed as if her mind was drawn in that direction; as if she were looking at something on the other side of the street; thought she had something in her hand; she was coming from the southeast corner and looking towards the northwest corner; when she was right on the track she stopped and suddenly turned her back to the car with her face towards the west; just about that time the car got so close the witness could not see whether she did anything more. The car was not more than ten feet away when she got to the north rail of the track and witness thought she got across the track; if she had taken one more step north she could

have got across; heard the motorman yell at her above all the other noise.

Con Ryan, a police officer, testified that he was on the car, did not see the accident; his attention was attracted by the constant ringing of the bell from about the middle of the block.

Henry V. Wilson, a police officer, testified that he and another police officer were in the yard back of a grocery store near Fourteenth street on St. Louis avenue when the accident occurred and heard the ringing of the gong and the hallooing of the motorman. He afterwards picked up a postal card about ten feet from the crossing addressed to the plaintiff; it was on the north side of the track.

Silas Kain and Mattie Kain, both deaf mutes, testified that the plaintiff told them in sign language that she got on the track to be killed because she had so much trouble with her husband.

The court refused to instruct the jury to return a verdict for the defendant and the result of the trial was a verdict for $800 in favor of the plaintiff.

*Boyle, Priest & Lehmann* and *Geo. W. Easley* for appellant.

(1)   The demurrer to the evidence offered at the close of plaintiff's case, and renewed at the end of the whole case, should have been sustained. The plaintiff, and all of her witnesses who saw the accident, testified that she did not look towards the car, but away from it. The fact that she was a deaf mute did not excuse her from looking. It required of her greater caution in using her sense of sight. 2 Thompson's Commentaries on Negligence, sec. 782 and cases cited. (2) The fact that the plaintiff was a deaf-mute "made it all the more negligent to risk his life by standing upon the railroad track without exercising his sight to avoid danger from an approaching train. The less ability one has to discover approaching danger the more careful

he should be in going within its reach." Railroad v. Ryon, 80 Tex. 59; 15 S. W. 589.

*P. H. Cullen* and *J. S. McIntyre* for respondent.

The proof in this case shows that the motorman failed to use reasonable or ordinary care to prevent a collision with plaintiff after he discovered her perilous position on the track and the company is therefore liable even though the plaintiff was guilty of negligence in attempting to cross at the time and place she was injured. Meyers v. Transit Co. (St. L. C. of A.), No. 8642, decided March 16, 1903; Werner v. Railway, 81 Mo. 368; O'Keefe v. Railway, 81 Mo. App. 387; Cooney v. Railway, 80 Mo. App. 226; Klockenbrink v. Railroad, 81 Mo. App. 404; McAndrew v. Railway, 83 Mo. App. 233; McAndrew v. Railway, 88 Mo. App. 97; Morgan v. Railway, 159 Mo. 262; Hutchison v. Railway, 161 Mo. 254; Chamberlain v. Railway, 133 Mo. 605.

GOODE, J.—The legal propositions contained in the instructions given by the trial court do not receive our entire approval; but we have not set out and shall not discuss the instructions because we think no case was made for the jury to determine.

We have given a full summary of the evidence in order to make a complete presentation of the plaintiff's conduct in connection with the accident in which she was injured. It is argued by the defendant's counsel that she was run over because of her own carelessness and ought to be nonsuited; and the due consideration of this contention requires that her actions both before and after she stepped on the track where she was hurt be regarded.

The statement of some witnesses that the car could have been stopped easily before it reached the plaintiff after the motorman began to ring the bell, may be put aside as of no moment; for at that time the plaintiff had just passed over the curb on the south side of

St. Louis avenue. The car was eighty steps away and the motorman had no reason to think she would walk in front of it despite warnings. He was not bound to put the car under control at the first sight of the plaintiff instead of relying on her observing it or being aroused by the bell. But she neither stopped nor noticed the car, but continued to go forward, apparently absorbed in the writing on the postal card and unconscious of danger; and as she was under the motorman's observation, this behavior ought to have warned him to get ready to avoid running against her. Plaintiff's deafness by no means excused her from taking care, but imposed on her the duty of using her sight to learn whether she might safely proceed; and when she went on the track without looking for a car, as she admits doing, she was negligent. Purl v. Railroad, 72 Mo. 168; Freeman v. Holden, 75 Md. 1; Galveston R. R. v. Ryon, 80 Tex. 59; 1 Thompson Comm. on Negligence, sec. 336. But such an act of negligence does not defeat an injured plaintiff's action if the defendant could have prevented the injury by reasonable efforts and did not try to prevent it. The rule of law in this State bearing on such cases has been declared often by the Supreme Court and we will give it as stated in the language of an apposite decision:

"It is settled that ordinary care and prudence require a person who is about to cross a railroad track at a street or public crossing, to look and listen for a train when by looking he could see, or by listening he could hear, an approaching train; and the omission to do either would be such negligence on his part as to prevent a recovery for an injury, provided his perilous condition was not and could not, by the exercise of ordinary diligence, have been discovered in time to avoid injuring him." Donohue v. Railroad, 91 Mo. 357.

The same doctrine is stated and approved in Kelly v. Railroad, 75 Mo. 138; Burham v. Railroad, 56 Mo. 338; Brown v. Railroad, 50 Mo. 461; Ives v. Railroad,

144 U. S. 408; Hays v. Railroad, 106 Fed. 48; Baltimore etc. R. R. v. Hellenthal, 88 Fed. 116; Baltimore etc. R. R. v. Anderson, 85 Fed. 413, and in other cases collected in the note to Bogan v. Railroad, 55 L. R. A. 419. We see, therefore, that the law does not hold the defendant harmless if the motorman could have stopped the car after he had cause to believe there was danger of running against the plaintiff. Nor is the inference inevitable that he only became aware of this danger when she stepped on the track.

In most instances, persons on streets where cars are running will have their attention aroused by the noise one makes or by the ringing of its bell, but this is not always true. Sometimes a pedestrian may be so engrossed as not to hear a car-bell, or, as in this instance, deaf so that he can not hear it. It is true too, that the behavior of a person may clearly signify before he goes on the track that he will go on it in unconsciousness of impending danger, and it then becomes the duty of the motorman or engineer to begin to obtain control of his car or engine before it is too late to avoid striking the person, if possible. Railroad v. Tartt, 99 Fed. 369.

For the foregoing reasons we would not hold that the plaintiff's negligence defeats her remedy as a necessary legal result, if she had been struck by the car as soon as she stepped on the track.

But the testimony of all the witnesses who spoke about the plaintiff's actions is, that after she had heedlessly walked in front of the car which threatened her, she turned around on the track instead of going off, as she could have done by taking another step. Most of the witnesses say the plaintiff stood with her back to the car; some that she turned about as though bewildered and started south again. But they all agree that she could have crossed safely if she had continued ahead and that the collision was caused by her either stopping or whirling to return to the south side of the street.

Hence, the fact that the motorman did not stop the car as quickly as possible was not the proximate cause of the accident; since, notwithstanding that circumstance, the plaintiff would have got across in safety if she had not altered her course. Allowing that the motorman was careless in failing to stop the car before it reached the crossing, no harm would have resulted had not the plaintiff's last act of negligence subsequently intervened; and her later negligence was the direct and proximate cause of the injury which no effort of the motorman could avert after she turned about. He could not know she would stop or turn back, for presumably she would go ahead and pass out of danger. It is no duty of a carman to stop cars in anticipation that a passenger who is going over a street crossing, and has time to get over before the car reaches him, may stop or turn around on the track and in consequence be run down. The motorman in the present case may have sufficiently checked his car when he saw there was some danger to the plaintiff, to have prevented a collision if it became apparent she could not get over the track before his car reached her; and he may have refrained from making a full stop when he, like the other witnesses, saw that to stop was apparently unnecessary because the plaintiff had time to cross. The degree of care one is required to take to avoid hurting another is proportioned to the likelihood of injury; or, to use another common and equivalent formula, is the care that men of ordinary prudence employ in similar circumstances. In ascertaining whether the proper caution was exercised by a defendant in a particular case, the habits and usual conduct of mankind are called to mind, since no one is required to, does, or can take precautions against sudden erratic acts. We must guard against events which, according to experience, may be expected to happen, but not those due to strange and abnormal behavior, or those which are possible but quite improbable. American Brewing Ass'n. v. Talbott, 141 Mo. 674;

Fuchs v. St. Louis, 133 Mo. 168.  Motormen have as much right to assume a traveler on a crossing will continue his progress as they have to assume that one whose manner shows he is conscious of his surroundings will not walk in front of a moving car.  Boyd v. Railroad, 105 Mo. 371.

Plaintiff's rash and thoughtless behavior while between the rails of the track is none the less fatal to her action for damages because she was absorbed by distressing news and was oblivious to danger; for those circumstances gave no intimation that she was likely to turn about or stand still until the car ran against her. Boyd v. Railroad, supra; Hill v. Drug Co., 140 Mo. 433.

As the plaintiff's negligence was shown to be the proximate cause of the injury, the request of the defendant that a verdict in its favor be directed should have been granted, and the judgment is reversed.  All concur.